IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

William J. Brown, II,            :

    Plaintiff,              :

  v.                             :       Case No. 2:11-cv-995

                                               :       JUDGE ALGENON L. MARBLEY
Commissioner of Social Security,         Magistrate Judge Kemp

    Defendant.

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, William J. Brown, II, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income. That application was filed on January 23, 2009 and alleged that plaintiff became disabled on May 14, 2008.

After initial administrative denials of his application, plaintiff was given a hearing before an Administrative Law Judge on May 10, 2011. In a decision dated June 13, 2011, the ALJ denied benefits. That became the Commissioner's final decision on September 9, 2011, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on February 14, 2012. Plaintiff filed his statement of specific errors on March 19, 2012. The Commissioner filed a response on April 23, 2012. No reply brief was filed, and the case is now ready to decide.

II. The Lay Testimony at the Administrative Hearing

Plaintiff's testimony at the administrative hearing is found at pages 47 through 68 of the record. Plaintiff, who was 33 years old at the time of the hearing and attended school through the ninth grade, testified as follows.

Plaintiff last worked in 2006, which was prior to the time

he had part of his leg amputated. At the time of the hearing, he was the custodial parent for his five-year-old child, but in the past he also had cared for his sister's children. He receives help from various people in caring for the child due to problems caused by his pain. He can climb steps, but sometimes needs to use his hands to do that.

In the past, plaintiff also worked as a crew leader at a Wendy's restaurant, and had the same job at a Rally's restaurant. He did have problems getting along with people at work. Other past work included pizza preparation and delivery, working in a warehouse, and construction work.

Plaintiff testified that he suffered a leg injury in October, 2007. He was fitted for a prosthesis at the end of November of the same year. He had problems with pain from putting pressure on his stump. One year after the injury, he was able to walk a block using a cane. He had follow-up surgery in 2009; before that, he had been using his prosthesis two to three times per week. Other times, he used a walker. The 2009 surgery helped him somewhat, allowing him to increase the use of his prosthesis. He was taking both pain medication and an anti-depressant. With medications, he could walk up to two blocks, but had difficulty walking on uneven surfaces.

On a normal day, plaintiff would get his son ready for school and do housecleaning. He was able to run a vacuum cleaner for twenty to thirty minutes. He did not socialize much.

### III. The Medical Records

The medical records in this case are found beginning on page 168 of the administrative record. The pertinent records can be summarized as follows.

Plaintiff was admitted to Grant Medical Center on October 6, 2007, for treatment of a gunshot wound to his left leg. He underwent a below-the-knee amputation originally, but a second

procedure was done to revise the amputation to above the knee. He met with a prosthetist about three weeks after the second surgery to be fitted with a stump sleeve. He was described as "doing well" the following month, and the amputation site was healing well. At that point, he was walking with a walker, and he had no complaints about pain in his stump or phantom pain. On December 18, 2007, his surgeon, Dr. Mehta, recommended prosthetic fitting.

When plaintiff saw Dr. Mehta again on May 27, 2008, he was reporting an electric-shock type feeling when he put pressure on his stump. He was walking with his prosthesis without any assistive devices, but walked with a limp. Examination revealed an area on the stump causing pain. Dr. Mehta's impression was superficial femoral nerve neuritis, moderately symptomatic. He was put on a trial of Lyrica. Almost a year later, he was reporting similar symptoms, and was diagnosed with neuroma of the stump involving the sciatic nerve. He was referred to a pain management physician. However, he did not undergo a recommended injection for pain, but instead came back to see Dr. Mehta. Plaintiff reported continuing to struggle with his prosthesis, and he had a tender spot which appeared to be a screw head. Plaintiff agreed to an open revision which would also involve removal of the screw. He underwent that surgery, which resulted in the excision of several neuromas. A good outcome was predicted. Shortly after the surgery, he was walking on crutches. His incision was doing well. The sutures were removed and he was given pain medication, and told to wait for another week before putting on his prosthesis. By August 25, 2009, he was doing much better and wearing his prosthesis, walking with only a slight limp.

The record also contains progress notes from Ace Prosthetics, Inc. On April 9, 2008, plaintiff was reporting that

the socket of his prosthesis was too tight.  The diameter of the
socket was increased and some other changes were made.  Plaintiff
reported being pleased with the changes and said he was much more
comfortable.  His issues at that time were described as being
unable to walk long distances or on uneven ground, but with
practice he was expected to improve in those areas.

Dr. Vogel, a state agency reviewer, examined the records and
expressed an opinion as to plaintiff's residual functional
capacity on May 6, 2008.  He thought plaintiff was limited to
working at the sedentary level with standing and walking for two
hours in a work day.  As of the date of his evaluation, there was
no evidence that plaintiff was using a walker or assistive
device.  Dr. Vogel did impose some postural limitations.

Plaintiff attended a consultative examination on March 26,
2009, which was done by Dr. Woskobnick.  He walked with a limping
gait and held a cane in his right hand.  The diagnoses included
status post multiple gunshot wounds with left above-the-knee
amputation and a prosthesis which was too long.  Plaintiff also
had chronic back pain and abdominal pain.  Subsequent to that
evaluation, Dr. Bolz reviewed the records and, like Dr. Vogel,
limited plaintiff to sedentary work, but noted that his use of a
cane appeared to be obligatory but he might be able to stop using
it if his prosthesis were fitted properly.

There are some additional records in the file.  However,
they were prepared after the date on which plaintiff concedes he
no longer met the requirements of Section 1.05B, so they will not
be discussed here.

## IV.  The Vocational Testimony

Dr. Walsh, a vocational expert, also testified at the
administrative hearing.  His testimony begins at page 68 of the
administrative record.  Dr. Walsh characterized plaintiff's past
work as ranging from light to very heavy in exertional level, and

-4-

as being either unskilled or semi-skilled.

Dr. Walsh was asked some questions about a hypothetical person who was able to lift ten pounds and could sit for up to six hours in a workday, and stand or walk up to two hours, with the use of a cane. That person could also climb ramps and stairs occasionally, could not kneel or crawl, could balance only occasionally, and could not be exposed to moving machinery or unprotected heights. Dr. Walsh testified that such a person could not do any of plaintiff's past work. However, such a person who also was of plaintiff's age and had his educational background could do some sedentary jobs such as packager, inspector, or assembler.

Dr. Walsh was also asked whether there would be jobs for someone who needed to use a walker or two crutches at least one day a week in a work environment. His response was that "I think we're moving to accommodated work given those additional situations." (Tr. 70). He was not asked to explain that answer further.

      V.  <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 9 through 22 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff had not engaged in substantial gainful activity from his application date of January 23, 2009 through the date of the decision. As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments "best described as (1) status post a (sic) October 2007 gunshot wound to his left lower extremity complicated by an infection and requiring an above the knee amputation of his left leg, (2) back, and (3) abdomen...." (Tr. 11). The ALJ also found that these impairments did not meet or equal the requirements of any section

-5-

of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff had the residual functional capacity to lift and carry ten pounds both frequently and occasionally, to sit with normal breaks for six hours in a work day, and to stand or walk for two hours total, with the assistance of a cane. Further, plaintiff could occasionally climb ramps and stairs and balance, and could not climb ladders, ropes, or scaffolds, kneel, crawl, work at unprotected heights, and work around hazardous machinery. The ALJ accepted the vocational expert's testimony that someone with such limitations could perform sedentary jobs such as packer, inspector, or simple assembler, and that approximately 1,200 such jobs existed in the regional economy and approximately 41,000 such jobs existed in the state economy. As a result, the ALJ concluded that plaintiff had not demonstrated an entitlement to benefits.

## VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises only a single issue. He asserts that the ALJ should have found that between the date of his amputation and August, 2009, he met the requirements of Section 1.05B of the Listing of Impairments, which deals with amputations. In particular, he claims that the medical evidence was not properly analyzed, and that if it had been, the ALJ would have found that he did not have the ability either to use a prosthetic device or to ambulate effectively during that time period, which are the prerequisites for a finding of disability under that particular section. The Court generally reviews the administrative decision of a Social Security ALJ under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the

Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Listing 1.05B presumes disability due to a lower extremity amputation "at or above the tarsal region" (which happened here) if certain criteria are satisfied.  In order to meet that Listing, the claimant must have "stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted for at least 12 months."  Section 1.00B2b defines the inability to ambulate effectively as "an extreme limitation in the ability to walk" characterized by "insufficient lower extremity functioning ... to permit independent ambulation without the use of hand-held

-7-

assistive device(s) that limits the functioning of both upper extremities." An individual can ambulate effectively if he or she is "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and includes being able to walk "without the use of a walker, two crutches, or two canes ...." Plaintiff contends that the evidence compels the conclusion that he satisfied these criteria from the date of his injury through August 25, 2009.

The ALJ specifically determined that plaintiff had not satisfied any of the sections of the Listing of Impairments. He did not specifically cite to Listing 1.05B, but rather stated that he had considered all of the Listings with particular attention on sections 1.02, 2.02, 2.03 and 2.04. (Tr. 15). The first of these deals with "major dysfunction of a joint," and the latter three deal with vision problems. Given that there is a section specifically devoted to amputations, it is somewhat surprising that the ALJ never mentioned this section specifically or explained why he concluded that plaintiff had not satisfied its requirements. The ALJ did state, however, that no medical source mentioned any findings which would meet or equal any listed impairment, and that appears to be true.

In his step four analysis (determining the claimant's residual functional capacity), the ALJ discussed the medical evidence in detail. He noted that plaintiff's treatment had been generally successful and that no physician had ever expressed the opinion that plaintiff could not work. The ALJ cited specifically to the April 2008 note showing that plaintiff's major limitations were in walking distances or over uneven ground, and concluded that his allegation of disability due to stump pain was not credible. The ALJ accepted Dr. Vogel's assessment and found plaintiff to have that residual functional capacity.

In his statement of errors, plaintiff does not argue that the ALJ's failure to mention Listing 1.05B directly, or to make a specific analysis of whether plaintiff was unable to walk without the use of a walker or crutches for a continuous 12-month period (which is what the Listing requires) was error. Rather, he argues that the more general finding made by the ALJ to the effect that no section of the Listing was satisfied is not supported by substantial evidence. As support for his argument, he cites to the medical evidence summarized above, which showed that from time to time plaintiff was having problems using or adjusting to his prosthesis, and his testimony that he could only use it two or three days per week until the 2009 surgery.

On this precise issue, the Commissioner's memorandum correctly points out that there is scant evidence, particularly in 2008, that plaintiff was continually unable to ambulate effectively for any twelve-month period. His major complaints about the prosthesis surfaced in April of 2009, when he developed a neuroma causing him pain, which led to the surgery that year. In 2008, all of the notes (and there are not many) show that he had made good progress and was walking either without any assistive devices, or with one cane, which is not enough to meet the requirements of section 1.05B. Both state agency reviewers thought he could stand or walk for up to two hours in a work day. Neither evaluation contained any mention of the need for him to use two crutches, two canes, or a walker, thus essentially precluding the use of his hands while standing or walking, and both thought he could climb stairs or ramps occasionally.

Again, focusing just on the issue of whether the record contains enough evidence from which a reasonable person could conclude that plaintiff's condition did not meet the Listings, it does. The presence of substantial evidence to support the opposite conclusion says nothing about whether the record would

permit either conclusion to be drawn, and has consistently been rejected as a basis for overturning an ALJ's decision.  See, e.g., Kalmbach v. Comm'r of Social Security, 409 Fed. Appx. 852, 859 (6th Cir. Jan. 7, 2011) ("If substantial evidence supports the ALJ's conclusion and the ALJ applied the correct legal standards, we are not at liberty to reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion").  Because that appears to be the gist of plaintiff's argument, the argument is not well-taken and does not support an order overturning the ALJ's decision.

## VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

## VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the

Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge